**COASTAL RECYCLING, INC.**

v.

**Richard F. CONNORS,[1] in His Capacity as Finance Director and Purchasing Agent of the Town of Johnston et al.**

No. 2003–322–Appeal.

Supreme Court of Rhode Island.

June 25, 2004.

---

1. Leo Fox (Fox), in his capacity as Finance Director and Purchasing Agent of the Town of Johnston, was named as a defendant. Fox has since vacated that office and was replaced by Richard F. Connors. The caption has been changed to reflect the current purchasing agent. *See* Super. R.Civ.P.25.

712

Thomas Dickerson, Esq., Michael T. Eskey, Esq., for Plaintiff.

Louis DeSimone, Jr. Esq., for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, and SUTTELL, JJ.

## OPINION

WILLIAMS, Chief Justice.

The Supreme Court is called upon to decide who will remove the rubbish, or "black gold," in the Town of Johnston. The intervening defendant, Rambone Disposal Services, Inc. (Rambone), appeals from a judgment in the Superior Court granting declaratory and injunctive relief and mandamus to the plaintiff, Coastal Recycling, Inc. (Coastal). The Superior Court's decision effectively overturned a decision made by the Town Council (council) of the Town of Johnston (town) rejecting Coastal's bid and recommending that Rambone be awarded the four-year refuse collection contract (contract) instead. Coastal alleges that after a series of private meetings between members of the council and representatives from Ram-

bone, the council speciously overturned the decision of the town's finance director and purchasing officer, Leo Fox (Fox), awarding the contract to Coastal. The trial justice determined that Fox had exclusive authority to award the contract and overturned the council's decision. Rambone timely appealed and this Court granted its request to expedite the review. Upon careful consideration, we conclude that the trial justice misinterpreted the law and reverse his decision and remand this case back to the town for proceedings in accordance with this decision.

## I

### Facts and Travel

Until the fall of 2002, a curbside refuse and disposal company called New England Ecological Development, Inc. (NEED), had a contract with the town to remove all residential refuse. By September of 2002, NEED fell into financial trouble and was unable to abide by the terms of the contract. The town immediately began the search to fill the four-year contract to collect all residential refuse, recyclables, and yard waste. Meanwhile, the town awarded an interim contract to Rambone.

Although ten companies expressed interest in the contract, set to commence on July 1, 2003, only five companies submitted bids. The bid application was long and set forth many minimum requirements before a bid would be considered. For example, the bid application required that bidders supply an answer for every applicable blank line on the application and specified that the town would not be bound by oral interpretations of the meaning of any specifications given by town officers, employees or agents. In addition, bidders were required to submit a bid security[2] of 15

2. Bid security is used if a contractor whose bid is accepted fails to enter the contract and

percent of the value of their proposed bid, or $20,000, whichever was more, in the form of a certified check or a bank cashier's or treasurer's check or bid bond. The bidders also were required to submit a letter signed by an insurance or bonding company certifying that if the bidder were awarded the contract it would be covered by a performance bond.[3] Additionally, bidders were required to submit separate prices for "bulky waste collection," recyclables collection, and yard waste collection.

The five bids were opened on October 16, 2002. Fox, as the town's purchasing officer, reviewed the applications and researched the backgrounds of the two lowest bidders. Coastal submitted the lowest bid, $4,858,900, and Rambone submitted the second-lowest bid, $5,577,486. Fox determined that both contractors were "qualified, responsive and responsible bidders." Fox sent a letter to Coastal informing the company that it had been awarded the contract, potentially subject to a town council decision made in the event of a "protest and public hearing brought by a competing bidder * * *."

Shortly after the bids were opened, Rambone sent a letter to the town alerting it to several deficiencies in Coastal's bid. Among other problems, Rambone noted that Coastal had failed to submit 15 percent of the value of its bid, $728,835, as bid security. Apparently relying on a conversation with Fox, Coastal had submitted a check for only $20,000. In addition, Coastal had failed to itemize its prices for refuse pickup and yard waste pickup for all four years. Furthermore, Coastal's letter from an insurance company stating that it would execute a performance bond if Coastal's bid were accepted was conditioned on Coastal's projected financial situation for June 2003.

On March 5, 2003, Rambone wrote another letter detailing the deficiencies in Coastal's application. He then met with members of the town council individually to give them the letters to discuss his concerns.

Noting that the council would be discussing the resolution to award the contract to Coastal on March 10, 2003, Rambone attended the town council meeting but did not participate. Coastal was unaware that issues regarding its bid would be discussed at the meeting and did not attend. At the meeting, Councilman Joseph A. Wells opined that because Coastal failed to meet all of the specifications set out in the bid application, Coastal's bid should not be considered. After a brief discussion of Coastal's application, including the failure to submit an appropriate bid security, the council moved to reject the resolution to award the contract to Coastal.

Once it was established at the hearing that the council would not accept the award to Coastal, confusion arose about what should next occur. Fox and Town Solicitor Louis A. DeSimone, Jr. (DeSimone) argued that although the council had authority to reject the bid, the council did not have the power to award the contract to another bidder. Conversely, the council was opposed to starting over and re-soliciting bids, as Fox suggested, and preferred to save resources by simply awarding the contract to the second "lowest, responsive, responsible bidder": Rambone. After a long discussion, the council

the town is forced to employ the services of a higher bidder. The bid security is used to pay the difference between the two proposed bids so the town is no worse off if the contractor it originally selected does not do the job.

3. A performance bond insures faithful performance in the full amount of the contract price.

voted unanimously to deny the resolution awarding the contract to Coastal and recommended that .the bid be awarded to Rambone.

When Coastal heard about the council's decision it filed a complaint in the Superior Court against Fox, the town, and the council members. Coastal requested a declaratory judgment and a writ of mandamus directing Fox to award the bid to Coastal and an injunction prohibiting the defendants from awarding the contract to any other bidders. Rambone intervened as a defendant, arguing that Coastal was without standing to challenge the council's decision and that the council's decision "awarding" the contract to Rambone was proper.

The trial justice determined, in a bench decision, that pursuant to G.L.1956 chapter 55 of title 45, "[i]t is the Purchasing Officer who runs the show, so to speak, regarding the bidding process. The Town Council and other town officials have little or nothing to do with it." He held that Fox "may execute at this point in time any necessary documents to bind the Town * * * in a contract as successfully bid for by Coastal * * *. [The council is] not to interfere with that in any way." Rambone then filed a motion to stay the judgment while it appealed to this Court which the trial justice denied. Rambone timely appealed and filed motions to stay the Superior Court's judgment and to expedite review. We granted both motions and heard oral arguments on May 10, 2004.

## II

### Discussion

■ It is well established that when reviewing the bidding process set forth in § 45–55–5, "the Judiciary will interfere with the award of a state or municipal contract only in the event that the award-ing authority has 'acted corruptly or in bad faith, or so unreasonably or so arbitrarily as to be guilty of a palpable abuse of discretion.'" *H.V. Collins Co. v. Tarro,* 696 A.2d 298, 302 (R.I.1997). "'[W]hen officials in charge of awarding a public work's [*sic*] contract have acted fairly and honestly with reasonable exercise of a sound discretion, their actions shall not be interfered with by the courts.'" *Id.* Chapter 55 of title 45, entitled "Award of Municipal Contracts," sets forth a uniform system "utilizing open cooperative bids" that municipalities must follow when awarding public contracts. Section 45–55–1. Section 45–55–3 states that "[w]ithin each city or town or quasi public agency there shall be designated a person or persons to act as purchasing officer to exercise the powers and duties as established in this chapter." Section 45–55–5 directs municipalities how to conduct competitive sealed bidding.

Section 8–38 of the Johnston Town Code states that the "finance director * * * shall perform the work of buying for the town, and shall, in accordance with this article, purchase or contract for all supplies, materials, equipment or work." Section 9.6(3) of the Johnston Town Charter describes the town's policy on competitive bidding and expressly states that "the purchasing authority may be directed by the [c]ouncil to reject any or all bids, and re-solicit bids * * * in the appropriate manner as prescribed above." The bid application completed by both Coastal and Rambone, however, alerts bidding applicants that "[t]he Town Council will award the Contract to the most qualified, responsive and responsible Bidder submitting the most advantageous bid to the Town."

■ Coastal argues that § 45–55–3 delegates all authority to conduct open bidding and award municipal contracts to one purchasing officer or officers. Therefore,

according to Coastal's argument, adopted by the trial justice, Fox, as the town's purchasing officer, had sole authority to award the contract and the council was without power to review that decision. Coastal argues that the state statute preempts the town's ordinance and charter and, thus, the provisions of the charter and bid application granting the council discretion to accept or reject the purchasing officer's decision are a nullity. We disagree.

■ A state statute preempts municipal ordinances when either the language in the ordinance contradicts the language in the statute or when the Legislature has intended to "thoroughly occupy the field." *Town of East Greenwich v. O'Neil,* 617 A.2d 104, 109 (R.I.1992). Coastal contends the Legislature intended to occupy the field by creating a uniform system to award municipal contracts. Such an interpretation strips town councils throughout the state of any opportunity to review major decisions that will cost their municipality a significant amount of money. Such an interpretation is at odds with the Home Rule amendment of the Rhode Island Constitution, which confers "the right of self government in all local matters." R.I. Const., art.13, sec. 1. Nothing in chapter 55 of title 45 proscribes the town councils from reviewing a decision made by a purchasing agent in accordance with the statute. Thus, we must read the town's ordinance and charter in *pari materia* with chapter 55 of title 45.

The town's policy of allowing the council to reject or accept any decision made by the purchasing officer, after the purchasing officer has followed the parameters set for accepting competitive bids, is wholly consistent with and supportive of the Legislature's intent to make the bidding system consistent throughout the state. This is not the first time this court has been asked to interpret a municipality's home rule charter in light of § 45–55–5. *See, e.g., H.V. Collins Co. v. Tarro,* 696 A.2d 298 (R.I.1997). Section 16–2–9 of the Barrington Town Charter granted the Town Manager, or Superintendent of the Schools when the school department was involved, responsibility "for the purchase and sale of all materials, supplies, equipment and public improvements * * *." *H.V. Collins Co.,* 696 A.2d at 303 (quoting section 16–2–9). Section 16–2–9(b) provides that purchases over $2,500 are subject to the approval of the town council, or school committee in situations involving the school department. In *H.V. Collins Co.,* 696 A.2d at 300, this Court reviewed the decision of the school committee to award a contract to improve a public school to the third-lowest bidder. The school committee made its decision after a separate building committee had accepted and reviewed all the bids submitted. Although not presented with the same issue before us, this Court analyzed § 45–55–5 together with Barrington's charter and did not question a supervisory committee's authority to accept a bid after a separate committee managed the bidding process. *H.V. Collins Co.,* 696 A.2d at 303. After considering the state statute in light of the town's ordinance and charter and recent case law, we conclude that the council had authority to reject any decision made by the town's purchasing officer, as it did here.

■ We briefly turn to whether the council exercised "sound discretion" in rejecting Fox's decision to award the contract to Coastal. *Gilbane Building Co. v. Board of Trustees of State Colleges,* 107 R.I. 295, 302, 267 A.2d 396, 400 (1970).[4]

4. Although the trial justice suggested that the council's decision was perhaps the result of

alleged long-term friendships between Rambone and various council members, this im-

The council found that Coastal did not meet the minimum requirements set forth in the bid application. Most notably, Coastal failed to submit a bid security pursuant to the specifications of the bid application. The application made clear that a bid applicant must submit a check or a bond of $20,000 or 15 percent of the proposed bid, whichever was more. Accordingly, Coastal was required to submit at least $728,835. When the council inquired why Coastal had failed to submit an appropriate bid security, Fox told them that he had informed Coastal orally that a check for $20,000 would be sufficient. At the deposition before trial, however, Fox testified that he told Coastal that it had to comply with the bid requirements. Regardless of what Fox told Coastal orally, the bid application expressly stated that "[n]o interpretation of the meaning of the specifications or other pre-bid documents will be made to any Bidder orally. Every request for such interpretation shall be made in writing addressed to the Purchasing Agent * * *." Furthermore, the section of the bid application addressing bid security makes clear that "No bid will be considered for a contract if a bid bond in the sufficient amount has not been submitted." Even if Fox had told Coastal it could submit a security bid of $20,000, that was in contravention of the bid application itself and Coastal was well aware that its application would not be considered unless it met the specifications of the bid application.

The issue, therefore, is whether the council exercised sound discretion in rejecting Fox's award to Coastal and we conclude that it did. We have held that pursuant to municipal charters such as the town's, municipal contracts can properly be awarded to a bidder "other than the lowest bidder when the awarding authority deems it in the public interest to do so." *H.V. Collins Co.*, 696 A.2d at 304. Before soliciting bids for the contract, the town had lost money when NEED pulled out of its contract. Understandably, this previous incident was on the council members' minds when they were considering the resolution awarding the contract to Coastal, which underbid the second-lowest bidder by $718,586 and failed to submit bid security that would cover such a difference in the event Coastal fell into financial trouble as NEED had. Coastal's application was deficient in additional respects as well but we need not address them at this time. We are satisfied that the council used sound reasoning and was well within its discretion to reject Coastal's bid.

■ We are now presented with the same issue the council grappled with at its meeting: What happens now that the council has exercised its authority to reject Coastal's bid? Section 9.6 of the town's charter provides the answer, stating that "the purchasing authority may be directed by the [c]ouncil to reject any or all bids, and re-solicit bids * * * in the appropriate manner * * *." Based on the plain language of the charter, it is clear that whether the council chooses to reject "any" bid *or* "all" bids the town then must re-solicit bids, following the process outlined in § 45-55-5, and Johnston's Home Rule

plication was simply a "footnote" to his decision. The trial justice based his decision on his interpretation of the statute, concluding that "Fox has prerogatives and responsibilities mandated by the legislature. He * * * had the authority conferred on him by the legislature by virtue of his appointment as Purchasing Officer by the Town * * * to pre-side over the bidding process, to determine the lowest, responsive and responsible bidder, and then to seek to enter into a contract." Coastal has not raised the issue of potential "corrupt or bad faith" conduct on the part of the council on appeal and we find no evidence of corruption on the record before us.

Charter, before a new bid can be accepted. *See In re Abby D.,* 839 A.2d 1222, 1224 (R.I.2004) (noting that "or" is " '[a] disjunctive particle used to express an alternative or to give a choice of one among two or more things' "). Therefore, the council lacked the authority to recommend that Rambone be awarded the contract. Once the council rejected Coastal's bid, the town council should have ordered a re-bid and the purchasing officer, as he expressly declared he intended to do, once again should have begun the bidding process.

In this town, in accordance with its charter, the purchasing officer is authorized to oversee the bidding process and make recommendations to the council. The council then is permitted to reject any or all of the bids that the purchasing agent collects. If the council rejects any bids and the town would still like to fulfill the contract, then the purchasing officer is called upon again to solicit bids, and the process begins anew. Of course the town is free to amend its charter to provide other bid options for the council and for the purchasing officer.

### Conclusion

For the foregoing reasons, we reverse the decision of the Superior Court and order the town to re-solicit bids pursuant to this decision. The record shall be remanded to the Superior Court.

Justice FLAHERTY did not participate.